STACKHOUSE, Appellee and Cross–Appellant,

v.

LOGANGATE PROPERTY MANAGEMENT et al., Appellants and Cross–Appellees.

[Cite as *Stackhouse v. Logangate Property Mgt.*, 172 Ohio App.3d 65, 2007-Ohio-3171.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 06 MA 124.

Decided June 21, 2007.

Charles Dunlap, for appellee and cross-appellant.

Douglas Kress, for appellants and cross-appellees, Donald Montgomery, Ronald Griswold, Logangate Builders, and Logangate Property Management.

Robert Tucker, Frank Mazgaj, and David Hanna, for appellants and cross-appellees, Four Links, Inc.

Craig Pelini, for appellants and cross-appellees, Continental Casualty Company.

VUKOVICH, Judge.

{¶ 1} Defendant Four Links, Inc. ("the developer"), appeals the decision of the Mahoning County Common Pleas Court, which granted judgment against the developer on the cross-claim for indemnity and contribution filed by the four Logangate defendants ("the builder") with regards to the negligent construction claim filed against them by Cynthia Stackhouse ("plaintiff"). Plaintiff cross-appeals from the trial court's damage award, contending that the court failed to consider an undisputed element of her damages. For the following reasons, the judgment of the trial court against the developer is affirmed, but the damage award for plaintiff is reversed, and the cause is remanded for recalculation using the fair-market-value test.

## STATEMENT OF FACTS

{¶ 2} Four Links, Inc., was the developer of the King's Lake development in Canfield, Ohio. In 1992, they sold the lot now known as 200 Queens Lane to the builder, represented here by Logangate Property Management, Logangate Builders, Inc., Donald Montgomery, and Ronald Griswold. The builder began construction of what the court found to be a 3,716–square–foot home. When the

house was framed and roofed, the builder sold the house to plaintiff, Cynthia Stackhouse, and her now deceased husband for $286,000 in 1993. Plaintiff then paid an additional $105,786 for the completion of the house.

{¶ 3} In September 1994, plaintiff and her husband took possession of the residence, but her husband died a few months later. Plaintiff gradually experienced various abnormalities with the house. For instance, a year and a half after plaintiff moved in, an interior door became misaligned. Then, her aquarium burst. In June 2000, a crack was seen in her Florida room. Additionally, the basement flooded, and more cracks were discovered in the basement walls and floors. After the flood, her insurance company conducted an investigation into the matter. They concluded that the lot was once a ravine, which was filled in with organic fill, and the house was constructed upon soil that had not been properly compacted.

{¶ 4} On June 9, 2003, plaintiff filed suit against the builder and the developer. She alleged that the developer backfilled and concealed a natural wet area and sold a lot that was not suitable for home construction. She alleged that the builder should have noticed the soil conditions. The builder filed a cross-claim against the developer for contribution and indemnity. The developer originally filed third-party complaints against the city of Canfield and certain site engineers; however, the city was granted summary judgment due to governmental immunity, and the claims against the site engineers were voluntarily dismissed. Then, plaintiff voluntarily dismissed the claim against the developer, likely due to privity issues. This left for trial plaintiff's claim against the builder and the builder's claim for indemnity and/or contribution against the developer.

{¶ 5} A bench trial began on October 3, 2005. Testimony was presented live and by deposition, and briefs were filed. On October 18, 2005, the trial court found that the builder should have recognized the presence of organic material in the soil during construction or did recognize it but ignored it. The court also found that the developer breached the standard of care to the builder and created a latent defect when they used organic fill and did not properly compact the soil in the development of the land. The court determined that it would cost $342,362 to reconstruct the same house. The court also found that the current house with the lot was worth only $100,000. The court then awarded the difference of $242,362 to plaintiff. The court also awarded $6,700.46 for out-of-pocket repair expenses and $25,000 for moving expenses. The court found that 10 percent of plaintiff's damages were attributable to the builder and 90 percent were attributable to the developer.

{¶ 6} On November 1, 2005, plaintiff filed a timely motion for a new trial or additur. She pointed out that the court subtracted the $100,000 for the current value of the house and lot but had already subtracted the value of the $45,000 lot

and $12,000 site improvements when starting with only the cost of constructing the house. She thus urged that her damage award be increased by $57,000.

{¶ 7} On November 15, 2005, the developer filed what it claimed was a joinder in plaintiff's motion for new trial. However, they did not join in plaintiff's argument. Rather, the developer sought a new trial on the issue of liability. The developer claimed that the judgment was against the weight of the evidence, alleging that they engaged in no development of the land and that the builder was the proximate cause of the injury. The developer then argued that the judgment was contrary to law because they sold the land as is and thus they can only be held liable for fraud. The developer also contended that damages for moving expenses were not warranted merely because plaintiff no longer wished to live in her house.

{¶ 8} The builder responded by pointing out that the developer's motion was untimely and was based upon the same arguments already rejected by the court. The new-trial motions were heard by a magistrate. On May 3, 2006, the magistrate found that since plaintiff's motion was timely, the developer could file its own new-trial motion even though 14 days had passed from the date of the court's judgment entry. The magistrate then found that a new trial should be granted in favor of the developer and partially for plaintiff. Objections were filed by the builder and plaintiff.

{¶ 9} On July 17, 2005, the trial court sustained the objections to the magistrate's recommendation to grant a new trial. The court found that its judgment was sustained by the weight of the evidence and that there was no good cause for a new trial. The court then specified that the developer acted so as to misrepresent how the lot was compacted and what material was used and that they presented the property as a properly graded residential lot.

{¶ 10} The court overruled plaintiff's motion for prejudgment interest from the builder because the builder made a reasonable offer to settle. The court noted that even if the developer did not make a reasonable effort to settle, plaintiff dismissed their claim against the developer, and the builder cannot receive prejudgment interest from the developer where they had to pay no prejudgment interest to plaintiff.

{¶ 11} The developer filed a timely notice of appeal from the court's July 17, 2006 and October 18, 2005 entries. The plaintiff filed a cross-appeal concerning the amount of damages. The builder initially filed a cross-appeal but later voluntarily dismissed it and decided to defend the trial court's judgment.

## DEVELOPER'S ASSIGNMENT OF ERROR NUMBER ONE

{¶ 12} The developer sets forth two assignments of error, the first of which alleges:

{¶ 13} "The trial court erred in granting judgment in favor of the Logangate defendants on their cross-claim against Four Links."

{¶ 14} Before addressing the developer's appellate arguments, we must note the builder's claim that the developer waived the caveat emptor and "as is" defenses by failing to raise them in the answer. See Civ.R. 8(C). First, the developer responds that the "as is" clause was tried by implied consent. The developer notes that evidence on the "as is" clause was developed at trial, and thus, the specific defense can be considered an amendment to conform to the evidence under Civ.R.15(B). The builder counters that they protested the presentation of a caveat emptor defense in their opening statement and the "as is" defense in their posttrial brief. Still, evidence was essentially still permitted to be presented on such matters.

{¶ 15} In any event, the developer urges that the defenses of assumption of the risk and failure to state a claim set forth in the answer sufficiently raised the caveat emptor and the "as is" defense. At least as to the assumption-of-the-risk defense, this appears to be a reasonable conclusion. Caveat emptor means "let the buyer beware" that he is *assuming the risk* of any open or reasonably discoverable defects. See, generally, *Lewis v. Basinger,* 7th Dist. No. 03MA223, 2004-Ohio-6377, 2004 WL 2726135, ¶ 9. See, also, *Frost v. Bank One of Fremont, N.A.* (Sept. 28, 1990), 6th Dist. No. S–89–32, 1990 WL 139903 ("The law governing sales of real property has long been that of caveat emptor * * * with the buyer assuming the risk on the quality or condition of the property * * * ").

{¶ 16} Additionally, an "as is" clause means that the purchaser *assumes the risk* of any latent defects. See, generally, *Lewis,* 2004-Ohio-6377, 2004 WL 2726135, at ¶ 9. Consequently, the defenses of caveat emptor and the existence of an "as is" clause are encompassed within an assumption of the risk defense raised in an answer for purposes of Civ.R. 8(C). See *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 434, 659 N.E.2d 1232 (raising generic assumption of risk in answer sufficient to preserve both implied and express assumption of risk under Civ.R. 8(C), even though they are distinct defenses). We conclude that the builder's waiver argument is without merit.

{¶ 17} Regardless, the developer's appellate arguments are without merit. The developer relies on the following basic holding in our *Lewis* case:

{¶ 18} "The doctrine of caveat emptor generally applies to all real estate transactions. That doctrine precludes recovery in an action by the purchaser where 1) the condition complained of is open to observation or discoverable upon reasonable inspection; 2) the purchaser had the unimpeded opportunity to examine the premises; and, 3) there is no fraud on the part of the vendor [such as fraudulent concealment of a latent defect]. *Layman v. Binns* (1988), 35 Ohio

St.3d 176, 519 N.E.2d 642, syllabus. Even more claims are precluded if the real estate is sold 'as is.' When a buyer contractually agrees to accept property 'as is,' the seller is relieved of any duty to disclose the property's latent conditions and only has the duty not to commit an affirmative fraud. *Kaye v. Buehrle* (1983), 8 Ohio App.3d 381, 383 [8 OBR 495], 457 N.E.2d 373." *Lewis*, 2004-Ohio-6377, 2004 WL 2726135, at ¶ 9.

{¶ 19} Here, as to the doctrine of caveat emptor, the trial court could reasonably find that the condition complained of was not open to observation or discoverable through reasonable inspection. That is, the builder could not openly observe that this lot was previously a ravine or that tons of organic fill were placed there without being properly compacted and made to look like a properly graded lot containing typical soil. Cf. *Layman*, 35 Ohio St.3d at 177–178, 519 N.E.2d 642 (where condition was easily observable).

{¶ 20} Moreover, testimony established that soil borings and consultations with geotechnical engineers are not aspects of the typical inspection by a builder who buys a graded lot in a residential development from a developer for the purpose of building a home. Contrary to the developer's argument, the purpose of testimony on such industry standards was not to interpret or alter the terms of the contract. Rather, such evidence was pertinent to the essential question of whether the defect was in fact discoverable through reasonable inspection. The court could reasonably answer this question in the negative.

{¶ 21} Thus, caveat emptor does not preclude the action as a matter of law as the defect can be considered latent. See id. at 178, 519 N.E.2d 642 (vendor has a duty to disclose material facts that are latent, not readily observable, or discoverable through a purchaser's reasonable inspection). Additionally, as is discussed infra, one could find fraudulent concealment of that latent defect. See id. (although defect was not latent in that case, court noted affirmative duty to disclose latent defect).

{¶ 22} At this point, the developer shifts its argument from the doctrine of caveat emptor to the existence of the "as is" clause. This is because the "as is" clause renders the observability or discoverability of the defect irrelevant since even latent defects are accepted under an "as is" contract. See *Lewis*, 2004-Ohio-6377, 2004 WL 2726135, at ¶ 9. The developer thus essentially claims that even if they dumped truckloads of organic fill into a ravine on the site, failed to properly compact the filled lot, graded over the fill to make it look like a developed lot upon which a house could be constructed, and sold the lot to a builder for purposes of constructing a residence, the clause in their sales contract with the builder whereby the builder takes the property "in its present condition" precludes any recovery against them for nondisclosure of a latent defect in the

absence of affirmative fraud. See, e.g., *Rogers v. Hill* (1998), 124 Ohio App.3d 468, 470–471, 706 N.E.2d 438 ("in its present condition" synonymous with "as is").

{¶ 23} The developer concedes that the actionable fraud can be a false representation *or an affirmative attempt to conceal.* The developer dwells on the proper law here and skims over the evidentiary question of whether they committed an affirmative act of concealment.

{¶ 24} The trial court in this case found that the developer affirmatively acted in a way so as to misrepresent how the lot was compacted and what materials were used. Moreover, a neighbor saw the ravine being filled with scrap and tree stumps during the time of development. Other testimony disclosed that the soil appeared and felt typical for a graded lot, implying that regular soil was used to cover organic fill. Considering this evidence, it is reasonable to conclude that the developer affirmatively concealed a defective condition that they purposely created. Cf. *Frost,* 6th Dist. No. S–89–32, 1990 WL 139903 ("Sellers of unimproved lots have no duty to disclose that land has been filled absent a showing that the seller had knowledge of the fill").

{¶ 25} Contrary to the developer's argument, this is more than a case of mere nondisclosure of a latent defect. Rather, it is the creation and the subsequent active as well as passive concealment of such a defect. The trial court found that the developer "acted in such a manner as to misrepresent how the lot was compacted and what materials were used." This is more than finding nondisclosure. Rather, it is a finding of affirmative fraud through concealment. Thus, there was no legal error here as such behavior is not protected by an "as is" clause even under the law cited by the developer. (The weight of the evidence to support the factual conclusions applicable to such legal test is discussed more infra where raised.) This assignment of error is without merit.

## DEVELOPER'S ASSIGNMENT OF ERROR NUMBER TWO

{¶ 26} The developer's second assignment of error contends:

{¶ 27} "The trial court erred in overruling Four Links' joinder in plaintiff Cynthia Stackhouse's motion for a new trial."

{¶ 28} Before addressing the developer's arguments, we note that the builder argues that the developer's new trial motion was untimely and thus cannot be the predicate for an assignment of error. According to Civ.R. 59(B), a motion for a new trial shall be served not later than 14 days after the entry of the judgment. Civ.R. 59(D) then provides:

{¶ 29} "Not later than fourteen days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party.

{¶ 30} "The court may also grant a motion for a new trial, timely served by a party, for a reason not stated in the party's motion. In such case the court shall give the parties notice and an opportunity to be heard on the matter. The court shall specify the grounds for new trial in the order."

{¶ 31} Although the developer's motion was not timely, the developer believes that the court could properly grant a new trial sua sponte (although using the grounds in their untimely motion) by using the last paragraph of Civ.R. 59(D). The developer's motion is unquestionably untimely. Without doubt, the trial court could have originally denied the developer's motion for such reason. Here, however, a magistrate used the grounds of the developer's motion as the basis for a grant of new trial (which decision the trial court subsequently overturned). The developer thus urges that such magisterial grant was done pursuant to the last paragraph of Civ.R. 59(D) and that the parties were given notice and an opportunity to be heard on the grounds of the motion.

{¶ 32} However, the last paragraph of Civ.R. 59(D) means the court can sua sponte grant a new trial *for the party who timely filed* a motion on grounds other than those raised. This is further supported by the fact that the first paragraph in Civ.R. 59(D) places a 14–day limit on even the trial court when it sua sponte grants a new trial but does not place that limit on a court who grants a new trial on grounds other than those raised in the moving party's motion. Therefore, the developer's interpretation of Civ.R. 59(D) is incorrect.

{¶ 33} Additionally, the magistrate only gave notice and opportunity to be heard on the motions. The magistrate did not specifically give notice that he was considering granting a new trial sua sponte on grounds other than those raised in the timely party's motion. The mere fact that an untimely motion was filed by one party after a timely motion was filed by another party and a hearing was set on all motions (including prejudgment-interest motions) does not put one on notice that the magistrate is utilizing Civ.R. 59(D). It thus appears that the developer's motion was untimely. As such, it should not have been granted by the magistrate for this reason alone.

■ {¶ 34} We note that the trial court found that the builder's untimeliness argument was moot since the court overturned the magistrate's decision and found that a new trial was not warranted on any of the grounds proposed by the developer. Notwithstanding any timeliness issues, the trial court was correct in finding that a new trial was not required on the grounds proposed by the developer. The developer urged that a new trial was warranted under Civ.R. 59(A)(6) because the judgment was not sustained by the weight of the evidence under Civ.R. 59(A)(7) because the judgment was contrary to law, under Civ.R. 59(A)(9) because of error at trial brought to the attention of the court, and under Civ.R. 59(A) in general based upon the sound discretion of the court for good

cause shown. As will be demonstrated, whether we review for abuse of discretion in refusing to grant a new trial or review the aspects of the new-trial motion as individual appellate arguments, the developer's arguments under this assignment are without merit.

{¶ 35} It is generally stated that a trial court's decision granting or denying a new trial on weight of the evidence grounds is reviewed for abuse of discretion. *McCrae v. Wal–Mart Stores, Inc.*, 7th Dist. No. 04MA275, 2005-Ohio-4472, 2005 WL 2065116, ¶ 12. Reversal for abuse of discretion requires a determination that the trial court's attitude is unreasonable, arbitrary, or unconscionable. Id., citing *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. The trial court, when considering a motion for new trial on the manifest weight of the evidence, has a duty to review the evidence submitted at the trial and to pass upon the credibility of the witnesses and the evidence. Id. at ¶ 13, citing *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685. It is also generally stated that a trial court is not permitted to grant a new trial even where it would have decided the case differently. Id. However, such rule deals with a trial court reviewing a jury verdict. When a trial court reviews its own judgment in the case of a bench trial, weight-of-the-evidence reversal is nearly unheard of.

{¶ 36} In general, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578. The trial court is in the best position to judge credibility by viewing voice inflection, demeanor, and gestures. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. Here, the court viewed the testimony of live witnesses. Although the court also viewed deposition testimony and the rationale of first-hand witness viewing would be inapplicable to such testimony, we still defer to the trial court's initial evidence weighing. *Taylor v. Kemp*, 7th Dist. No. 05BE13, 2005-Ohio-6787, 2005 WL 3489759, ¶ 26 (we cannot arbitrarily substitute our judgment for that of the trial court on factual matters merely because the parties agreed to submit the case on documentary evidence), citing *State v. DeHass* (1967), 10 Ohio St.2d 230, 230, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 37} Here, there was some competent and credible evidence going to the essential elements of the builder's action against the developer for contribution and/or indemnity. A long-time resident testified that the lot in question was previously a ravine. Other testimony confirmed this fact. The resident revealed that he witnessed the repeated dumping of fill (including tree stumps) on the lot, which disguised its true character. Testimony alleged that the developer's agent

was aware of this dumping. The developer sold the lot to the builder for purposes of building a residence. The builders testified that the lot was graded so that no evidence of its prior character was open to observation.

{¶ 38} One could conclude through evidence and inference that the developer dumped truckloads of inappropriate material over a ravine with intent to sell it as a future residential building site, failed to properly compact the material, covered the material with typical soil and clay, and graded the lot to look ready-to-build. A rational fact-finder could conclude that such acts constituted affirmative acts of fraudulent concealment, which overrides the "as is" clause in the contract between the builder and the developer.

{¶ 39} Even if the builder noticed some organic-like material near a certain part of the dig site, this does not imply that the builder knew the full extent of the cover-up or knew that inadequate compaction was a problem, or otherwise was the unindemnifiable proximate cause of the sinking foundation. As the builder points out, the zoning inspector did not halt the project merely because he viewed some organic material; but, if the problem with the fill was that noticeable from the dig site, he would likely have done so. Although there was evidence that the builder could have done more testing, the trial court was in the best position to weigh the evidence and assign values to the pieces of evidence set before it. The court's judgment was not against the manifest weight of the evidence.

{¶ 40} As to the judgment being contrary to law based upon the "as is" clause, this argument was addressed de novo in assignment of error number one. Specifically, we agreed with the developer's argument that the "as is" clause precludes recovery in the absence of affirmative acts of fraud such as concealment. However, as set forth under the weight of the evidence analysis, a reasonable person could conclude that the developer committed such affirmative acts.

{¶ 41} Lastly, the developer argues that after awarding damages to make plaintiff whole, there was no basis for awarding an additional $25,000 in moving expenses simply because plaintiff did not wish to reside in the house. We note that the developer is not arguing that $25,000 is excessive for moving fees. Rather, the developer argues that no moving expenses are permissible in a damage award.

{¶ 42} The developer suggests that plaintiff irrationally wishes to move. However, the defective lot is the whole impetus for the action. Plaintiff should not be required to accept this lot that was previously and naturally a ravine and hope any new site preparation will hold up over time and nature. This would not make her whole, as the bargained-for lot was one that was not a filled-in ravine.

It should be pointed out that even if she were to reconstruct her house (because the court apparently found the cost of restoration exceeds the cost of reconstruction), her belongings would have to be moved. In fact, most belongings would have to be moved even in the case of a mere restoration, where the house is jacked up and the foundation replaced. Thus, even if her house could be salvaged or a new house constructed on the lot, some moving expenses would be incurred. Therefore, it is not merely plaintiff's desire to leave this unstable and mutated lot behind that is the cause of moving expenses.

{¶ 43} Notably, the developer has no issue with the part of the damage award granting out-of-pocket expenses that plaintiff incurred as a result of the defects at issue. In a case such as this, the incidental damage of moving is just as reasonable. Incidental damages such as these are a permissible part of tort recovery. See, e.g., *Amurri v. City of Columbus* (Feb. 28, 1985), 10th Dist. Nos. 84AP–597, 84AP–598, 84AP–618, 84AP–619, 84AP–681, and 84AP–682, 1985 WL 9634 (where moving expenses were an example of incidental damages permissible in the case of a destroyed building under common law and Ohio tort law). This assignment of error lacks merit.

## PLAINTIFF'S ASSIGNMENT OF ERROR

{¶ 44} The plaintiff's sole assignment of error within her cross-appeal provides:

{¶ 45} "The trial court erred in denying plaintiff's motion for additur in the sum of $57,000, and in not granting her a full measure of damages in the sum of $399,362."

{¶ 46} Conflicting testimony was presented on the square footage of the house, the fair market value of the house and realty if there were no defects, and the value of the house and realty as it is now. As to the latter, the court found that the current value of the house and realty is $100,000. This valuation is not contested. The court accepted the testimony of Mr. Vantell, the builder's expert, that the house measured 3,716 square feet rather than plaintiff's expert's testimony that the house measured 4,180 square feet. This measurement is not contested.

{¶ 47} Partly based upon these differing square footages, partly based upon the expert's varying choices of comparable sales, and partly based upon the assigned quality of the residence at hand, the fair market value of the house (if it had no foundation defects) was estimated differently by the expert for plaintiff and the expert for the builder. Plaintiff's expert set the fair market value at $420,000 if the house had no foundation defects, while Mr. Vantell stated that this fair market value would be $350,000.

{¶ 48} Mr. Vantell gave an alternate opinion as to plaintiff's damages by using a cost-approach basis. He estimated that the cost to construct plaintiff's house is $342,362, the value of the lot is $45,000, and the value of the site improvements is $12,000, for total of $399,362. He then subtracted $47,931 for what he opined was the depreciation of the residence based upon its age.

{¶ 49} The court did not adopt any approach in whole. In fact, the court did not make a conclusion as to the fair market value if there were no defects. Rather, after agreeing with Mr. Vantell's square footage measurement, the court agreed that the cost to construct plaintiff's house is $342,362. The court found that plaintiff is entitled to that amount minus the $100,000 current value of the house and realty. Thus, the court awarded her $242,362. This is the issue here. (The court also awarded her $6,700.46 for wasted expenditures plaintiff made on the house and $25,000 for moving expenses. These elements of damages are not part of this assignment of error; the propriety of awarding moving expenses was raised in the developer's second assignment of error.)

{¶ 50} Plaintiff filed a motion for a new trial or additur. Since it was a bench trial, an actual new trial would not have been required. "On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and enter a new judgment." Civ.R. 59(A).

{¶ 51} Plaintiff argued then and reiterates now that this award should be increased by $57,000, the value the builder's expert assigned to the lot and site improvements. Plaintiff urges that the court's award failed to consider all elements of her damages essentially because the court should have subtracted the $100,000 from the $399,362 figure, not from the $342,362 figure.

{¶ 52} The developer responds that plaintiff is not entitled to money for a new lot and site improvements merely because she does not want to live on that lot and claims that her position places her in a position that is "better than whole." The builder claims plaintiff's argument as to damages would result in an award that exceeds that allowed by the fair-market-value test and that even using the cost approach, the argument fails to take into account the expert's subtraction of $47,931 for the house's depreciation.

{¶ 53} The Fourth District has stated that the court can use a cost-of-reproduction method of calculating damages in a breach-of-construction-contract case. See, e.g., *Ohio Valley Bank v. Copley* (1997), 121 Ohio App.3d 197, 210, 699 N.E.2d 540, citing 5 Corbin on Contracts (1964) Section 1089. That court continued, however, that if the reasonable cost of reconstruction creates economic waste, then the fair-market-value test should be used, taking the fair market as the structure should have been constructed minus the value of the imperfect

structure. Id., citing Corbin at 1090. We recognize that the case at bar is a tort case.

{¶ 54} The Ohio Supreme Court once stated that if land has sustained a permanent or irreparable injury based upon the tort of another, damages are limited to the difference in the market value of the property, including improvements, before and after the injury. *Ohio Collieries Co. v. Cocke* (1923), 107 Ohio St. 238, 248, 140 N.E. 356 (where neighboring mine caused subsidence and water diversion). If the injury is temporary and thus susceptible to repair, then, generally, the landowner may recover the reasonable cost of restoration, plus the reasonable value of the loss of the use of the property between the time of the injury and the restoration. Id.

{¶ 55} Thereafter, the Ohio Supreme Court stated that where restoration of a damaged building is practicable, damages should represent the reasonable cost of restoration. *Northwestern Ohio Natural Gas Co. v. First Congregational Church of Toledo* (1933), 126 Ohio St. 140, 150, 184 N.E. 512 (dealing with negligent destruction of church by explosion and fire). Where restoration is impracticable, the measure of damages is the difference between the reasonable fair market value before and after the damage. Id. More specific to that case, the court added that when a destroyed church building had no real market value but had much useful and actual value, diminution in market value can be exceeded by considerations such as reconstruction costs in order to determine the value. Id. To reiterate, we quote the following passage:

{¶ 56} "It is difficult to state a rule for measuring damages equally applicable in all cases involving either the total or partial destruction of a building by a fire negligently caused. As urged by counsel for plaintiff in error on oral argument at rehearing, fundamentally it is the purpose of the law to afford to the person damaged compensation for the loss sustained. In a case involving the destruction of a building by fire negligently caused, where restoration is impracticable, the measure of damages is the difference between the reasonable value immediately before the damage and the reasonable value immediately afterwards.

{¶ 57} "In applying the foregoing rule, it is proper to take into consideration the cost of reconstruction, since that is clearly an element in determining the value of the building destroyed, depreciation and obsolescence on the property, original building cost, marketability of the building damaged, and the use to which it was being put by the person damaged.

{¶ 58} "In cases in which restoration of the building damaged can be made, the measure of damages is the reasonable cost of restoration or repairs." Id.

{¶ 59} Here, it seems the trial court's calculation mixed together the fair-market-value approach, the restoration-cost approach, and a reproduction-cost

approach. Fair market value and restoration are distinct tests with separate elements, and reproduction is an element in determining value when fair market value is wholly unconscionable to the owner as in a case where there is no market for the building.

{¶ 60} As aforementioned, the trial court based its damage award on the cost to reproduce the house, finding Mr. Vantell's estimate of $342,362 to be credible. However, the court then subtracted the current fair market value of the house and lot in the amount of $100,000. Thus, the damage award was decreased to $242,362.

{¶ 61} Yet, reproduction cost is not restoration cost. The court must start with restoration, then move to fair market value and finally consider reproduction/re-building only if there is no conscionable market value. In any case, the current value of $100,000 is not to be subtracted when calculating restoration or reproduction cost.

{¶ 62} In point of fact, under the court's $242,362 damage award, plaintiff could not rebuild her house even if she wanted to stay on the defective lot. She would be forced to sell her lot in order to obtain the full amount the court itself found was needed for reproduction. This is the basis for her contention that she is left without a lot and site improvements. However, the value of the lot and site improvements is not generally included in the reproduction or restoration cost (unless some site improvements need replacing after reconstruction such as landscaping). It is not actually the $57,000 that is the problem. The real issue is the subtraction of the current value in a restorative damage award, not the failure to value the site and its improvements.

{¶ 63} We cannot merely add back the $100,000 for various reasons. First, plaintiff does not seek this remedy; had she, the builder may not have dismissed its cross-appeal. Moreover, the amount awarded was for reconstruction rather than repair, and reconstruction is not the starting point under the Supreme Court's precedent. Even if the court could award reconstruction costs, reconstruction of a new house on this lot would not be possible unless demolition of the old house occurred. Reconstruction would also require site work on the lot and its soil (if found practicable) and likely a different foundation than a typical house. Restoration would also require this work. Nevertheless, these elements were not considered in the court's award.

{¶ 64} No one contends here that the restoration approach is practicable, and in fact, the restoration approach is impracticable. See *Northwestern*, 126 Ohio St. at 150, 184 N.E. 512. This conclusion is based upon four factors: (1) the court did not allow for restoration cost, (2) the lot is the genesis of the problem, (3) plaintiff does not wish restoration on the lot and would never have purchased the lot if she knew of the defect, and (4) some estimates for restoration were

economically wasteful considering the cost to rebuild, and plaintiff's wariness of the success of restoration is understandable. Because restoration is impracticable, the measure of damages should be the difference between the reasonable value before and after the damage. See id. Such valuation is actually that set forth by the builder as being the appropriate measure of damages.

{¶ 65} Plaintiff urges, however, that a fair-market-value formula is inappropriate because there was no state of "before the damage" since the injury always existed but was previously concealed. However, this is a twist of semantics. Moreover, only the state of the soil was concealed; the house was not damaged at the time of the sale. Stated differently, had the improper lot never manifested in damages, there would be no action concerning the damage to the house. We note that the Fourth District's case refers to the amount of proper recovery as the fair market value if the house were constructed as ordered minus the currently imperfect house, rather than stating before and after the injury. *Ohio Valley Bank,* 121 Ohio App.3d at 210, 699 N.E.2d 540, citing Corbin at 1090. Accordingly, the fair-market-value test is not necessarily prohibited when the underlying latent defect was a pre-existing condition on the land.

{¶ 66} In conclusion, the credit for the $100,000 current market value should have been utilized in the fair-market-value approach rather than in the trial court's reproduction-cost analysis. However, we cannot employ such an approach on appeal as we are not the trier of fact. Contrary to the builder's suggestion, Mr. Vantell's appraisal of $350,000 is not the accepted figure merely because the trial court agreed with Mr. Vantell's reproduction-cost estimate. The court's entry noted the range of appraisals but did not choose a figure for fair market value assuming a nondefective house and lot.

{¶ 67} Thus, the damage award dealing with the valuation of the loss to the house must be reversed, and the cause must be remanded. Such remand would not affect the portion of the damage award granting plaintiff her out-of-pocket repair expenses or her moving expenses. Additionally, the court already assigned a current fair market value of $100,000 for the defective house and lot, and this conclusion is not contested.

{¶ 68} On remand, the court should assign a fair market value of the house and land prior to the manifestation of the defect, assuming that the house was built on a nondefective lot. According to the parties' admissions and the testimony presented, the lowest fair market value assigned is $350,000 and the highest was $420,000. In making its own determination of fair market value, the trial court can consider various factors, which we outline for guidance.

{¶ 69} Besides the varying appraisals, the trial court can consider reproduction costs *including the value of a comparable and stable lot and site improvements.* (By not including these and then subtracting the $100,000, the court subtracted

for the lot and site twice.) The court can also consider plaintiff's outlay for the house and land ($391,786.32). These are not tests of fair market value but are valid considerations in choosing between or averaging the experts' opinions.

{¶ 70} The court can also look at the alleged depreciation of the residence weighed against any testimony on the state of appreciation in Canfield or in that development. That is, the court can disbelieve the pertinence of Mr. Vantell's market-value testimony when it means that one could build a house in Canfield in 1994 and be left with a house with a lower fair market value in 2005 than what was expended. On the other hand, the trial court could attribute a portion of plaintiff's cost in construction to an elevator, which may not have proportionate resale value.

{¶ 71} We note here that Mr. Vantell's estimate rated plaintiff's house condition as average but rated the comparable sale houses as superior. He adjusted the fair market value by a negative $15,000 according to this rating. He pointed to marks and damage on floors and walls in support of his rating. However, we note that plaintiff was not putting her house on the market at that time and could clean and paint if she were selling a nondefective house; in other words, there is no incentive to have your carpets cleaned or to scrub up after repairmen when your house is literally falling apart at the seams. Moreover, Mr. Vantell was not inside the comparable houses to view any possible flaws.

{¶ 72} In sum, the trial court should assign a fair market value to plaintiff's house (which includes the lot and improvements) if the house and lot had none of the disputed defects and subtract from that the $100,000 current market value that is not contested. Since this was a bench trial, the court can take additional evidence or merely amend its findings of fact and conclusions of law. See Civ.R. 59(A).

{¶ 73} For the foregoing reasons, the judgment of the trial court against the developer is affirmed. The judgment on plaintiff's damages is reversed, and this cause is remanded to the trial court for evaluation of fair market value.

Judgment affirmed in part
and reversed in part,
and cause remanded.

DeGenaro, P.J., and Waite, J., concur.