NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0281n.06

No. 22-4009

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 16, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MICHAEL HOREJS; LAUREN HOREJS; RICK ARQUILLA, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| DAVID KITCHIN; NANCY KITCHIN, | ) ) | OPINION |
| Defendants-Appellees. | ) ) | |

Before: BOGGS, GIBBONS, and McKEAGUE, Circuit Judges.

BOGGS, Circuit Judge. In September 2018, David and Nancy Kitchin sold the home that they had lived in for seventeen years to their friends, Michael and Lauren Horejs. Prior to the sale, the Horejses personally inspected the home four times. Mrs. Horejs noticed an off-putting smell in the basement, which Mrs. Kitchin attributed to her dog and cat. The Horejses did not otherwise notice any issues with the home and waived their right to further inspection. More than three months after the Horejses moved in, they turned on their furnace, and the smell permeated the household. The Horejses also visually identified mold growing in the basement. After a costly remediation process, the Horejses sued the Kitchins for breach of contract, fraud, unjust enrichment, and negligent misrepresentation.

The district court granted summary judgment to the Kitchins. For the following reasons, we affirm.

## I. BACKGROUND

### A. Prior Ownership and Repair of the Property

From 1988 until 2001, Fe and Lito Alino owned and lived in the single-family, two-story home located at 8695 Twilight Tear Lane in Cincinnati, Ohio. In 1989, the Alinos hired a contractor to refinish the basement. Mrs. Alino did not observe the work, but was told that the contractor installed (1) a drop ceiling and (2) framing and drywall over the concrete basement walls. Mrs. Alino stated that this was the only construction work that the Alinos performed on the home. She also testified that they never experienced any issues with the house associated with water intrusion, sewer backup, structural deficiencies, or mold.

In 2001, the Alinos sold their property to David and Nancy Kitchin, who lived there for the next seventeen years. During a pre-purchase inspection, the Kitchins' home inspector noticed that the basement floor was not level. Because the Kitchins wanted to construct a bedroom for their daughter in the basement, they hired a contractor to level the flooring and assure them of the structural integrity of the slab, which the contractor did. The Kitchins replaced the basement carpet in 2007 and claim that there was no indication, at that time, of mold or water intrusion, or that the slab was defective.

In 2016, the Kitchins noticed cracks in the brick mortar on the front face of their house and in the chimney area. They enlisted a structural engineer to inspect the home. The engineer provided a written report, which stated:

> Based upon the size, location, and patterns of the cracks in the brick veneer I recommend that the old mortar be completely removed in small sections and new mortar tuck pointed to restore the bond between the bricks. After these repairs are made if any new movement takes place it will be evident by similar cracks between the bricks as seen now. If this happens then the installation of steel piers below the foundations may be required.

A brick mason repaired the cracks.

The Kitchins testified that during their residency they did not experience or know of any issues related to "water intrusion events in the basement," "sewer backup," or "mold anywhere in the home." They also stated that they did not perform any maintenance work on the drywall in the basement and that they were unaware of the lack, or removal, of brick foil sheeting behind the basement walls.

**B. The Horejses' Offer and Purchase of the Property**

In 2018, the Kitchins contracted to sell their property to the Horejses. Before closing, they provided the Horejses with a completed copy of a State of Ohio Residential Property Disclosure Form. On that form, the Kitchins denied any knowledge of leakage or of material problems stemming from water intrusion, the water supply, or the sewer system. They also denied knowledge of any water- or moisture-related damage or of drainage/erosion issues affecting the property. The Kitchins, however, admitted that they did not have the property inspected for mold by a qualified inspector. Two lines down from that admission, the form warned:

> **Purchaser is advised that every home contains mold. Some people are more sensitive than others. If concerned about this issue, purchaser is encouraged to have a mold inspection by a qualified inspector.**

The Kitchins did acknowledge a leak from the hall-bathroom skylight, which was repaired in February 2018, and the mortar-crack issue, which was repaired in 2016. They also provided the Horejses with a copy of the structural engineer's 2016 report.

For their part, the Horejses visited the home four times before closing, including twice before making an offer. They walked through every room of the house and the basement on each occasion. During the second, third, and fourth walk-throughs, Mrs. Horejs noticed an "off-putting

smell" in the basement.[1] When she asked Mrs. Kitchin about it, Mrs. Kitchin attributed the odor to her cat's litter box and the fact that the cat and their dog lived in the basement. Mr. Horejs stated that he "smelled something" only once. He credited Mrs. Kitchin's explanation "because [the Horejses had] a dog of [their] own" and he assumed that the smell was probably just the dog. Mrs. Horejs did not see any sign of water intrusion or leakage. Her father, Rick Arquilla, also visited the home before the Horejses made an offer. Arquilla, the former COO of the plumbing and water-mitigation company Roto-Rooter, did not smell any off-putting odors and also did not see any sign of water intrusion or leakage.

In July 2018, the Horejses signed and sent the Kitchins a Contract to Purchase the Property. In the Contract, the Horejses waived the right to conduct inspections of the Property "to determine the material physical condition of the house, land, improvements, fixtures, equipment, any additional structures, and any hazardous conditions on the Real Estate," but reserved the right "to walk-through the property with in [sic] 14 days of contract acceptance." The Contract further stated that:

> **"SELLER(S) . . . SHALL NOT BE RESPONSIBLE FOR ANY UNKNOWN AND/OR DISCLOSED DEFECTS IN THE REAL ESTATE. BUYER ACKNOWLEDGES THAT BUYER HAS BEEN ADVISED BY REALTOR® TO CONDUCT INSPECTIONS OF THE REAL ESTATE THAT ARE OF CONCERN TO BUYER AND HAS BEEN PROVIDED THE OPPORTUNITY TO MAKE THIS CONTRACT CONTINGENT UPON THE RESULTS OF SUCH INSPECTION[S]."**

The Horejses believed that they made an "as-is offer . . . [and] agree[d] to purchase the home . . . without any modifications or repairs." They would later explain that they waived their

---

[1] In his deposition, Arquilla stated that the Horejses did not smell anything until over three months later, when they first turned on the house's furnace.

right to an inspection because the Kitchins, who were trusted family friends, had told the Horejses that the house "was well taken care of."

In September 2018, the Horejses closed on the house and moved in.

### C. Mold and Water-Intrusion Issues

But the smell in the basement persisted. The Horejses hired a carpet-cleaning service to no avail. Summer turned to autumn. The Horejses turned on their furnace, and the foul odor spread throughout the house. After animal control failed to locate the source, Arquilla suggested checking for mold.

On January 4, 2019, Arquilla sent Jason Garrett, a field supervisor at Roto-Rooter, to investigate the odor. Garrett inspected the basement and identified mold on various baseboards, both sides of the drywall, the studs and framework behind the dry wall, the tack strips that held the carpet in place, and personal belongings in the basement utility room. Using a thermal camera, he also identified water in the basement carpet. Garrett informed the Horejses that there was "significant mold throughout the basement" and advised them to move out of the house until his team could remediate the issue.

Garrett returned to conduct follow-up investigations as to the source of the mold. He identified two main causes: hydrostatic pressure entering through fault lines in the house's foundation and a leaking drain-pipe. Garrett further noticed stain differences on the wood floor and, using a laser, discovered a three-inch dip in the basement slab. On a later visit, Garrett removed the cover of a humidifier attached to the HVAC system and noted that the filter was rotted through and covered in mold.

When asked if there was any evidence that the previous owners knew about the water-intrusion and mold issues, Garrett responded that he "[could]n't speak" to that.

Anthony Jordan, a water-mitigation technician at Roto-Rooter, also participated in the remediation process. He visually identified mold on the basement utility-room door and drop ceiling. Jordan then removed portions of the basement and found mold under the carpet and behind the baseboards, drywall, and back wall. He also discovered mold upstairs in the kitchen area, underneath some of the wall cabinets. Jordan and his team began to clean the contaminated portions of the kitchen and basement, a process that took about one month.

Unlike Garrett, Jordan opined that the Kitchins must have known about the water damage. Jordan set out his findings as follows:

> Based on my Professional opinion, the homeowners previous to the Horejs' [sic] knew about the water damages that took place in this home.
>
> KITCHEN
>
> The dining area and kitchen hard wood floors are all the same finish, the hardwood has cupping & crowning along with separation; this was covered up with sanding and refinish work. What makes me believe a water loss occurred, is that only these areas were finished while the other areas were not finished.
>
> MAIN SEWER STACK
>
> The house is shifting and the main stack was cracked due to the stress on the stack. This looked like it was cracked for quite sometime [sic].
>
> BATHROOM
>
> Mold was on the base boards. When lifting the ceiling tile there was microbial growth present.
>
> BAR
>
> Due to the house shifting, water was coming in from the deck, the wall was not sealed properly, lack of maintenance on tuck point. I shot a laser of the floor and it showed a 3 inch drop in the floor.
>
> KIDS PLAY AREA
>
> There was previous water damage in this area. There was evidence of new mortar done recently at the tuck points. There was evidence of new carpet and pad on the floor. In the walls, there was new framing, new insulation, and a vapor barrier added.

Jordan, however, later testified that he did not know whether a refinish had been performed. He also acknowledged that he is not a structural engineer and that there could have been other causes for the house shifting other than a crack in the main stack. Jordan assumed that the previous owners would have identified the crack due to the water damage to their drop ceiling or kitchen cabinets, but admitted to seeing no such water damage.

Arquilla also hired Steven Bostwick, a forensic architect, to investigate the damage. Bostwick identified other water-intrusion issues, at least some of which, he believed, prior owners would have been aware of. First, he noted that water was entering the home because it had been constructed without code-required sill pans under the window of the first-floor office and under the patio/deck doors in the kitchen and living room. This resulted in significant damage to the underlying plywood, which Bostwick was able to identify only after the basement had been deconstructed. Because the defect had been part of the original construction, Bostwick guessed that the "leakage [may have] started as early as in the first couple years after the construction was complete." Bostwick also identified the absence of code-required sill pans as the most likely source of water in the basement wall.

Second, Bostwick observed that "the [basement] wall's exterior [foam] sheathing had been removed almost completely and not replaced." Bostwick noted that such removal "could only occur if the entirety of the drywall and insulation had been removed during some prior construction activity." He opined that the "most reasonable cause for the observed exterior sheathing's removal would be during a prior water intrusion/mold remediation as those events typically involve the removal of affected/contaminated materials." Bostwick concluded that the homeowners at the time would have known that the sheathing had been removed, as the need to remove it "would have

been reported to the homeowner during a remediation and or renovation" and the "removals would also have typically been described in invoices."

Third, Bostwick noted that a "leveling compound was installed prior to the carpet installation as a means to level out settlement and cracking of the original floor slab." He concluded that because the leveling compound would have added time and cost to the carpet installation, the prior homeowners "would have known or been made aware of the floor settlement and slab cracking either by observation of the floor during carpet installation or by the contractor performing the installation."

Bostwick later acknowledged that he could not specify whether the speculated remediation would have taken place when the Alinos or the Kitchins owned the house. He also noted that the deterioration of the plywood would have been difficult to see "unless someone popped their head up . . . above the ceiling where there were stains on the ceiling."

James Graham, a structural engineer who worked alongside Bostwick, also concluded that somebody likely removed the basement wall's exterior foam sheathing during a previous mold-remediation procedure. But like Bostwick, he also could not identify who had ordered the removal of the sheathing. Graham also admitted that he did not know of any previous mold remediation and that his theory was speculative—though he stated that, in his experience, "there's no reason to remove exterior sheathing" absent a mold or water-saturation issue.

Finally, Kevin Saylor, a plumbing technician at Roto-Rooter, conducted a forensic investigation of the house's sewer system. Using a camera, Saylor and a field supervisor observed that the "system was flooded, bellied out, back pitched, [and] retaining water." Saylor recommended that the entire system be replaced. Based on the amount and location of sewage debris, Saylor concluded that there must have been a previous backup. But he also admitted that

he had no actual knowledge of a prior backup and could not pinpoint when the backup would have occurred.

In her deposition testimony, Mrs. Horejs acknowledged that she and Mr. Horejs did not see any evidence of water intrusion during the first three months living at the home. She also stated that they did not see water entering the home until March 2019, during the remodeling. Arquilla also stated that neither "the Horejses nor myself noticed anything" until the furnace was turned on and "that's when all hell broke loose."

### D. Procedural History

In September 2019, the Horejses sued the Kitchins in Ohio state court. They asserted claims for (1) breach of contract; (2) fraudulent misrepresentation and concealment; (3) unjust enrichment; and (4) negligent misrepresentation. The Kitchins removed the case to federal court and, after nearly three years of discovery, moved for summary judgment.

The district court granted the Kitchins' motion for summary judgment on November 10, 2022. The court first noted that neither party disputed that the Horejses' offer to purchase the home was made "as is." And, while the purchase contract did not contain an express "as is" clause, the Horejses expressly waived their right to an inspection and believed that they were purchasing the home "as is." The district court thus concluded that this was an "as is" purchase. It further noted that, under Ohio law, an "as is" purchaser is precluded from obtaining relief for negligent misrepresentation or breach of contract absent a demonstration of affirmative fraud. If the Horejses could not establish affirmative fraud, caveat emptor would shield the Kitchins from liability for structural defects that were discoverable upon reasonable inspection, and the "as is" nature of the sale would relieve the Kitchins of any duty to disclose latent conditions.

In their response opposing summary judgment, the Horejses provided findings and testimony from contractors who had renovated the home to argue that the Kitchins must have known about the mold and water-intrusion issues. But the district court concluded that this evidence was "speculative" and insufficient to demonstrate "a genuine issue of material fact that the Kitchins *actually knew* about and misrepresented or concealed defects in the home." The court emphasized that the Kitchins consistently denied knowledge of the issues and that the Horejses did not observe the issues on multiple walk-throughs and not until living at the home for over three months. Because "the evidence was not sufficient to establish when the problems first arose nor . . . that the Kitchins knew about the problems and misrepresented or concealed them," the district court held that the Horejses could not establish fraud as a matter of law and granted summary judgment to the Kitchins on all claims.

The Horejses timely appealed.

## II.   ANALYSIS

We have jurisdiction pursuant to 28 U.S.C. § 1332. This court reviews de novo a district court's grant of summary judgment. *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022). Summary judgment is appropriate "where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all reasonable factual inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Miller v. State Farm Mut. Aut. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). Under Ohio law, courts apply different interest-analysis tests depending on whether the underlying claim is based

in contract or tort. *Id.* at 824–25. Here, because the parties entered into the purchase contract in Ohio and the alleged fraud occurred in Ohio, there is no dispute that Ohio law controls.

In Ohio, the doctrine of caveat emptor bars a purchaser's recovery for a structural defect in real estate where "(1) the defect [was] open to observation or discoverable on reasonable inspection, (2) the purchaser [had] an unimpeded opportunity to examine the premises, and (3) the vendor [did] not engage in fraud." *Layman v. Binns*, 519 N.E.2d 642, 644 (Ohio 1988). Caveat emptor does not preclude claims based on latent defects. *See Stackhouse v. Logangate Prop. Mgmt.*, 872 N.E.2d 1294, 1299 (Ohio. Ct. App. 2007). But "[w]hen a buyer contractually agrees to accept property 'as is,' the seller is relieved of any duty to disclose the property's latent conditions and only has the duty not to commit an affirmative fraud." *Ibid.* Thus, while caveat emptor and an "as is" clause operate to bar claims for "passive nondisclosure," they do not "protect a seller who positively misrepresents or conceals the complained of condition[s]." *Hubbard Fam. Trust v. TNT Land Holdings, LLC*, 9 N.E.3d 411, 420 (Ohio Ct. App. 2014); *Rodgers v. Sipes*, 2012 WL 2553921, at *7 (Ohio Ct. App. July 2, 2012) (noting that "an 'as is' clause in a contract can bar a breach of contract claim").

The elements for a claim of fraudulent misrepresentation include: (1) an actual or implied misrepresentation, (2) which is material to the transaction, (3) made with knowledge that the statement is false, (4) with the intent to mislead another, (5) who relies on the misrepresentation, and (6) with resulting injury. *Southworth v. Weigand*, 2002 WL 2027523, at *3 (Ohio Ct. App. Sep. 5, 2002); *Hubbard Family Trust, LLC*, 9 N.E.3d at 421.

Barring exceptional circumstances, arguments that are not raised below are forfeited on appeal. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).

### A. Caveat Emptor and the "As Is" Nature of the Purchase

The Horejses argue that the doctrine of caveat emptor does not bar their claims, because the defects to the house were not discoverable upon reasonable inspection.

Reasonable minds could disagree about whether an inspection of the home would have revealed the various defects discovered during the remediation process. Before the Horejses turned on the furnace, the defects were invisible. That the Horejses did not discover the source of the odor or evidence of water intrusion on any of their four pre-purchase visits—and not until after three months of living at the home—also suggests that the defects were latent. To ascertain the source and extent of the mold, the contractors were required to rip up the carpet and tear apart the basement, actions that may not be reasonable for a pre-purchase home inspection. *See Southworth v. Weigand*, 2002 WL 2027523, at *4 (Ohio Ct. App. Sep. 5, 2002) (noting that where "the extensive damage [is] hidden under carpeting and wallpaper[,] [it] is not reasonable to expect a home inspector or potential buyer to remove carpeting and wallpaper to ascertain if there is a problem"). The sewer-system issues were also only discoverable upon the hiring of a plumbing specialist and use of a camera. In sum, it is debatable whether a reasonable inspection would have revealed these defects and, thus, whether caveat emptor applies to bar the Horejses' non-fraud-based claims.

Nevertheless, those claims would still be barred if the Horejses purchased the home "as is." *See Stackhouse*, 872 N.E.2d at 1299. The Horejses thus argue that the district court erroneously found that the purchase contract was an "as is" contract, even though it did not contain an "as is" clause.

The Horejses did not make this argument below. In fact, in their response to the Kitchins' motion for summary judgment, they appear to state just the opposite:

> Despite the Defendants [sic] insistence that the "as is" clause in the real estate contract and the doctrine of caveat emptor – aka buyer beware – protects them from Plaintiffs' claims, Defendants' defenses fail because "both caveat emptor and the 'as is' clause of the purchase agreement are nullified by a fraudulent misrepresentation or fraudulent failure to disclose[.]"

In an email containing the purchase contract that the Horejses' realtor sent to the Kitchins, the realtor wrote: "Please keep in mind that this is an as-is offer. Mike and Lauren [Horejs] think the Kitchins have taken very good care of their house and are willing to pass on any home inspections and believe this is a great home." In her deposition testimony, Lauren Horejs agreed that she and her husband were making an "as is" offer. She understood that they were "agreeing to purchase the home as it currently [was] without any modifications or repairs." And, as discussed above, they waived inspection of the property, despite being warned about the presence of mold in every home and that "**SELLER(S) . . . SHALL NOT BE RESPONSIBLE FOR ANY KNOWN AND/OR UNDISCLOSED DEFECTS IN THE REAL ESTATE**." **R. 2, PID 59 (emphasis in original).**

Under these circumstances, whether or not there was an "as is" clause in the contract is beside the point. The district court based its judgment on the arguments before it. The Horejses never argued that this was not an "as is" contract: they maintained that it was. Having done so, the Horejses cannot now claim the reverse on appeal. As a result, the Horejses have forfeited any challenge to the district court's grant of summary judgment to the Kitchins on the non-fraud-based claims. *Scottsdale*, 513 F.3d at 552.

## B. The Horejses' Remaining Fraud Claim

Neither caveat emptor nor an "as is" clause precludes relief for fraudulent misrepresentation or concealment. *See Stackhouse*, 872 N.E.2d at 1299. The Horejses claim that the evidence that they have provided raises a genuine issue of material fact as to whether the Kitchins knew about the various defects and misrepresented or concealed them.

First, they point to the testimony of Garrett, who detected water in the basement carpet, identified two sources of water intrusion in the basement, and noted a three-inch dip in the basement slab. The Horejses also rely on Jordan's observations that parts of the kitchen's hardwood floor had been refinished, suggesting prior water issues, that the drain stack was cracked, and that water was entering the basement because the back wall had not been properly sealed. They also cite Bostwick's findings that the lack of sill pans around the doors contributed to water intrusion and that the exterior sheathing along the back wall had been removed, suggesting a prior water or mold remediation project. Based on this testimony, and the fact that the Horejses experienced mold growth in the basement within four months of living at the home, the Horejses argue that the Kitchins must have known.

We disagree. As discussed above, a reasonable inspection of the home would likely have failed to reveal the various defects. The Horejses walked through the home four times prior to the purchase and did not see any evidence of mold or water intrusion. And although the Horejses smelled an off-putting odor—Arquilla did not—they credited Mrs. Kitchin's statement that the smell came from the dog and cat. Until they turned on the furnace, the Horejses lived in the home for over three months without incident. And professional plumbers discovered the source and extent of the mold, water-intrusion, and sewer-system issues only after taking apart the basement and performing sophisticated camerawork.

The record indicates that the Kitchins, who lived in the house for seventeen years, undertook repairs for structural defects of which they were aware, including leveling the basement slab and repairing mortar cracks. For the latter, they received a structural engineer's report that recommended only minor repairs and listed none of the issues identified by the Roto-Rooter employees. All of this information was provided to the Horejses prior to the sale. The Horejses

have not produced evidence of any other repairs undertaken by the Kitchins that would indicate knowledge of the latent defects. And the Kitchins have consistently denied any such knowledge.

The Ohio Residential Property Disclosure Form cautions that "**every home contains mold**" and cautions any purchaser "**concerned about this issue . . . to have a mold inspection by a qualified inspector.**" That is what the Horejses should have done. The district court did not err in holding that there was no genuine issue of material fact as to the Kitchins' actual knowledge of the latent defects. On this record, they appear to have been just as hidden from the Kitchins as they were from the Horejses.

### III.    CONCLUSION

Because the Horejses have failed to demonstrate a genuine issue of material fact as to whether the Kitchins knew about the latent defects and sought to conceal them, we AFFIRM the district court's grant of summary judgment.